# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

№ 08-CV-1247 (JFB) (ETB)

Alternative Electrodes, LLC,

Plaintiff,

versus

Empi, Inc. and Encore Medical, L.P.,

Defendants.

**MEMORANDUM AND ORDER**
February 4, 2009

Joseph F. Bianco, District Judge:

Plaintiff Alternative Electrodes, LLC ("plaintiff" or "AEL") brought this action against Empi, Inc. ("Empi") and Encore Medical, L.P. ("Encore") (collectively, "defendants"), alleging violations of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, and antitrust violations under the Sherman Act, 15 U.S.C. § 2, *et seq.*, as well as averring claims for illegal monopoly, defamation, false advertising, tortious interference with contract, tortious intereference with prospective business relationship, civil conspiracy and breach of contract under New York State law.

Defendants now move for dismissal of all claims in the complaint, except the Lanham Act claim, pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, defendants' motion is granted in part and denied in part.

I. Background

A. Facts

The following facts are taken from the amended complaint ("Am. Compl.") and are not findings of fact by the Court. The Court assumes these facts to be true for the purpose of deciding this motion and construes them in the light most favorable to plaintiff, the non-moving party.

Defendant Empi is a wholly-owned subsidiary of DJO Inc. Defendant Encore Medical is DJO Inc.'s surgical implant division. (Am. Compl. ¶¶ 4-5.) "Defendants market and sell a range of electrical muscle stimulation devices, including the VitalStim device." (*Id.* ¶ 10.) The VitalStim device ("VS") is used to treat a medical condition called dysphagia, or difficulty swallowing, which affects an estimated 15 million

Americans. (*Id.* ¶ 11.) The VitalStim requires replacement electrodes throughout the life of the machine.

Defendants allegedly dominate the market for electrodes that can be used with the VitalStim device. (*Id.* ¶ 13.) In fact, plaintiff alleges that "Defendants have an almost 100% market share in this relevant market and enjoy substantial profit margins." (*Id.*) According to the amended complaint, plaintiff "poses a business threat to the Defendants, because Plaintiff distributes far less costly electrodes that can be used with the Defendants' VitalStim device." (*Id.* ¶ 12.) Plaintiff has distributed these electrodes since 2006. (*Id.* ¶ 14.) Prior to that time, "VitalStim customers had no choice but to buy electrodes from Defendants because no other electrodes could connect to a VitalStim device." (*Id.*.) Plaintiff alleges that "defendants' electrodes can only be used once and cost approximately $18 per four-pack, which upon information and belief, represents a profit margin of $15 or 600%." (*Id.* ¶ 17.) "Alternative Electrodes offered electrodes that, unlike those of Defendants, are reusable" and cost $8.95 per four-pack. (*Id.* ¶ 18.) Nevertheless, plaintiff has had sales of "far less than 1% of the Defendants' sales in the relevant market." (*Id.*)

According to the amended complaint, "[i]n order to protect its monopoly, Encore and its affiliated entities threatened, and then filed, patent infringement lawsuits against competitors within the electrode market." (*Id.* ¶ 15.) Plaintiff alleges that defendants also issued "repeated false statements about the manufacturers' purported failure to meet Food and Drug Administration ("FDA") regulatory requirements." (*Id.*)

Plaintiff alleges that, less than three weeks after it made its first shipment of sample electrodes to potential customers in October of 2006, "The Chattanooga Group, a division of Encore Medical at the time [and the manufacturer of the VitalStim device], issued a 'Risk Management Alert' nationwide to all VitalStim customers, including an estimated 100 customers in New York, 're: Alternative Electrodes.com: Preventing Possible Adverse Events.'" (*Id.* ¶ 20.) Plaintiff alleges that this advisory contained several false and misleading statements including that Alternative Electrodes: "(1) may compromise patient safety; (2) may reduce efficacy in terms of patient outcomes; (3) have generated performance concerns by VitalStim clinicians in the field; (4) are not cleared to market by the FDA for the treatment of dysphagia; and, (5) carry unsubstantiated manufacturer claims regarding safety, compatibility and clearance for use with the VitalStim system." (*Id.*) The amended complaint further alleges that "Empi and its authorized dealers continue to repeat these statements to this day to Alternative Electrodes' customers and potential customers." (*Id.*) The amended complaint lists many potential customers that have allegedly informed plaintiff that they will not purchase plaintiff's electrodes as a result of statements made to them by defendants. (*Id.* ¶¶ 22-23.) The timeframe of these alleged statements are not entirely clear, but appear to range from that initial Risk Management Alert through at least 2008.

Plaintiff also alleges that Encore Medical, VitalStim and ESD LLC filed suit against it on December 20, 2006, alleging patent infringement. This suit was dismissed pursuant to a confidential settlement agreement between the parties entered into on August 23, 2007. (*Id.* ¶ 26, Ex. G.). As part

2

of this agreement, Encore Medical, VitalStim and ESD agreed not to make certain statements about the safety of plaintiff's product. Plaintiff alleges that the recent statements made by defendants about its electrodes violate this agreement. (*Id.* ¶¶ 26-27.)

The amended complaint further alleges that Empi threatened another patent litigation as recently as February 2008 against another company which recently began selling electrodes manufactured by plaintiff's manufacturer. (Am. Compl. ¶ 30.) Empi also allegedly sent "mailings with false and misleading statements to current and potential customers of Alternative Electrodes" in February 2008. (Id. ¶ 31, Ex. F.)

B. Procedural History

Plaintiff filed the complaint in this action on March 27, 2008. On July 21, 2008, plaintiff filed an amended complaint. On October 2, 2008, defendants filed a motion for dismissal pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiff submitted its response to the motion on November 3, 2008. On November 24, 2008, defendants submitted their reply. Oral argument was heard on January 23, 2009. All of the submissions have been considered by the Court.

II. STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). The plaintiff must satisfy "a flexible 'plausibility standard.'" *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1969 (2007). The Court, therefore, does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974.

In connection with a motion to dismiss under Rule 12(b)(6), the Court normally may only consider "facts stated in the complaint or documents attached to the complaint as exhibits or incorporated by reference." *Nechis,* 421 F.3d at 100; *accord Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir. 1991). The Court may only consider a document not appended to the complaint if the document is "incorporated in [the complaint] by reference" or is a document "upon which [the complaint] *solely* relies and . . . is *integral to the complaint*." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)) (emphases in original). Courts also "'routinely take judicial notice of documents filed in other courts . . . not for the truth of the matters asserted in other litigation, but rather to establish the fact of such litigation and related filings.'" *Crews v. County of Nassau*, No. 06-CV-2610 (JFB), 2007 U.S. Dist. LEXIS 6572, at *5 n.2 (E.D.N.Y. Jan. 30, 2007) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)). Thus, in the instant case, this Court can consider the patent litigation plaintiff references in the amended complaint, because it is integral to plaintiff's claims, and consists of documents filed in another court being

3

considered not for its truth, but for the fact of its filing.

III. Discussion

A. Sherman Act Claims

Plaintiff's amended complaint alleges claims for unlawful monopolization and attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2. The Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

"[I]n order to state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must establish '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). To state a claim for attempted monopolization, a plaintiff must allege that: (1) the defendants engaged in predatory or anticompetitive conduct; (2) with a specific intent to monopolize; and (3) a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 99-100 (2d Cir. 1998); *see Dolan v. Fairbanks Capital Corp.*, No. 03 Civ. 3285 (DRH), 2005 U.S. Dist. LEXIS 45308, at *20 (E.D.N.Y. Aug. 16, 2005). Furthermore, "[f]or any antitrust violation, 'a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent.'" *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562 (1981). That is, the amended complaint must allege facts which show injury to competition, as distinct from injury to plaintiff as a competitor. *See Jarmatt Truck Leasing Corp. v. Brooklyn Pie Co., Inc.*, 525 F. Supp. 749, 750 (E.D.N.Y. 1981) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, (1977) ("The antitrust laws . . . were enacted for the protection of competition not competitors.") (internal quotation marks and citation omitted)).

Defendants argue that plaintiff's monopolization claims should be dismissed because plaintiff (1) suffered no cognizable injury and, therefore, lacks standing, and (2) has failed to plead the relevant market definition adequately. The Court will address each argument in turn.

1. Standing

To survive a motion to dismiss, a complaint must allege "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994) ("It is now well settled that in order to have standing to prosecute private antitrust claims, plaintiffs must show more than that the defendants' conduct caused them an injury."). "In addition to injury in fact to the plaintiff's business or property caused by the

antitrust violation, 15 U.S.C. § 15, antitrust standing for a private plaintiff requires a showing of a special kind of 'antitrust injury,' as well as a showing that the plaintiff is an 'efficient enforcer' to assert a private antitrust claim." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117 (2d Cir. 2007) (citing *Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 537-45 (1983)). Thus, it is insufficient that plaintiff suffered from defendants' allegedly wrongful behavior; competition itself must be threatened as well. *Paycom Billing Servs. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006) ("'[t]he antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior'") (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis in original)). "Showing such an injury requires identifying the practice complained of and the reasons such a practice is or might be anticompetitive." *Port Dock*, 507 F.3d at 122. Plaintiff need not prove that competition has been harmed; it is sufficient to show a likelihood that competition would be diminished. *Brunswick Corp.*, 429 U.S. at 489.

In addition to the harm defendants' anticompetitive behavior allegedly caused plaintiff, plaintiff also alleges that defendants have diminished competition in the VitalStim compatible electrodes market in general through frivolous patent litigations and publishing false statements about its competitors. The costs of defending against frivolous patent litigations and business disparagement alone do not necessarily rise to the level of an antitrust injury that the antitrust laws were enacted to prevent. However, such allegations can be sufficient where it is alleged that the combined effect of the allegedly sham litigation and the other alleged conduct is such that it threatens to exclude all competitors from a market. *See, e.g., Xerox Corp. v. Media Sciences Int'l Inc.*, 511 F. Supp. 2d 372, 381 (S.D.N.Y. 2007). This is the precise injury alleged here. Plaintiff alleges that these actions have resulted in the following injuries:

> Defendants' unlawful conduct has stifled competition in the VS Compatible Electrodes market and has had a direct, substantial and adverse effect on competition by monopolizing the VS Compatible Electrodes market, artificially creating barriers to entry in the VS Compatible Electrodes market, and foreclosing competition on the basis of price and quality. Defendants' anticompetitive conduct was instituted so that it could illegally maintain the monopoly profits that it reaped from purchases of VS Compatible Electrodes.
>
> But for Defendants' conduct, all purchasers of VS Compatible Electrodes would have been able to purchase comparable if not superior electrodes for use with the VitalStim device at lower prices. In addition, Defendants' anticompetitive conduct has reduced the output of VS Compatible Electrodes. Entry into the VS Compatible Electrodes market has been effectively foreclosed by Defendants' disparagement

campaign and sham litigation scare tactics.

By foreclosing competition through unlawful actions, Defendants prevented VS Compatible Electrodes purchasers from purchasing lower-priced VS Compatible Electrodes and prevented these purchasers from improving patient access and care. Indeed, the harm to patient care has been severe. Due to the unlawful monopoly prices of VS Compatible Electrodes, caregivers, such as speech pathologists, have had to forego providing VitalStim treatment to patients who have potentially fatal swallowing disorders and may be on feeding tubes.

(Am. Compl. at ¶¶ 51-54.)

Based on the above, it is clear that plaintiff has alleged the kind of injury to competition that antitrust laws were designed to prevent. Further, plaintiff is an efficient enforcer under the standard laid out by the Second Circuit, and defendants do not argue to the contrary. *Balaklaw v. Lovell*, 14 F.3d 793, 798 (2d Cir. 1994) (if the Court determines that the plaintiff has alleged an antitrust injury, "they must then determine whether any of the other factors, largely relating to the directness and identifiability of the plaintiff's injury, prevent the plaintiff from being an efficient enforcer of the antitrust laws."). The Court, therefore, need only assess whether the conduct alleged to have caused these injuries – sham litigation and deceptive business disparagement – is conduct that antitrust laws appropriately target.

Plaintiff's Sherman Act claims are brought based on two distinct theories – namely, that defendants have brought sham litigation as a means of limiting plaintiff's ability to compete against them and that defendants have wrongfully disparaged plaintiff's product in order to unlawfully limit competition. Defendants argue that plaintiff's claims based on sham litigation are barred by the *Noerr-Pennington* doctrine and that plaintiff's claims based on business disparagement do not constitute anticompetitive behavior. As set forth below, the Court disagrees.

a. Sham Litigation

Defendants argue that the *Noerr-Pennington* doctrine bars plaintiff's antitrust claims based on defendants' patent litigation. Plaintiff argues that the litigation at issue here constitutes sham litigation and, therefore, is not protected by the *Noerr-Pennington* doctrine.

"There is no question that the pursuit of litigation may, in some circumstances, constitute a form of anti-competitive activity." *In re Fresh Del Monte Pineapple Antitrust Litigation*, 04 MD 1628 (RMB) (MHD), 2007 U.S. Dist. LEXIS 1372, at *52-*53 (S.D.N.Y. Jan. 9, 2007). Such allegations are limited, however, by a principle known as the *Noerr-Pennington* doctrine, which was developed to protect First Amendment rights to petition government. *California Motor Transp. Co. v. Trucking Unltd.*, 404 U.S. 508, 510-11 (1972); *see also United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669-570 (1965); *Eastern R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 134-36 (1961). The doctrine "immunizes legislative, executive and judicial activity from antitrust

6

liability even if the activity is designed to eliminate competition." *Mover's & Warehousemen's Assoc. of Greater New York, Inc. v. Long Island Moving & Storage Ass'n, Inc.*, 98 CV 5373 (SJ), 1999 U.S. Dist. LEXIS 20667, *18 (E.D.N.Y. Dec. 16, 1999). This principle does not apply, however, to "sham" litigation. *Noerr*, 365 U.S. at 144 (immunity may not apply to litigation that is "a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor"); *California Motor Transport*, 404 U.S. at 512-13 (immunity does not apply to litigation involving "unethical conduct in the setting of the adjudicatory process" or "a pattern of baseless, repetitive claims"); *accord Otter Tail Power Co. v. United States*, 410 U.S. 366, 380 (1973) ("repetitive lawsuits carrying the hallmark of insubstantial claims" are unprotected); *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 635 n.6 (1977) ("repetitive, sham litigation in state courts may constitute an antitrust violation") (plurality opinion).

In *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993), the Supreme Court laid out the definition of "sham" litigation for these purposes:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. . . . Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals 'an attempt to interfere *directly* with the business relationships of a competitor' through the 'use [of] the governmental *process* – as opposed to the *outcome* of that process – as an anticompetitive weapon.' This two-tiered process requires the plaintiff to disprove the challenged lawsuit's *legal* viability before the court will entertain evidence of the suit's *economic* viability."

*Professional Real Estate*, 508 U.S. at 60-61 (internal citations omitted). A suit is not objectively baseless if there is probable cause to sue. *Professional Real Estate*, 508 U.S. at 62.

Plaintiff's amended complaint alleges the following: "It was evident from the beginning of the [patent] litigation that the primary, if not sole purpose, of instigating suit was to advise customers of the pending (but meritless) litigation and attempt to drive Alternative Electrodes from the market. The litigation was objectively unreasonable and was initiated in order to interfere directly with Alternative Electrodes' business relationships and activities." (Am. Compl. ¶ 24.) Plaintiff further alleges that "[t]he sham patent suit strategy failed. Recognizing the frivolity of the claim in light of prior art, these Defendants completely dismissed their suit on October 3, 2007 without any penalty or payment of any kind by Alternative Electrodes." (*Id.* ¶ 25.) The parties entered into a settlement agreement dated August 23, 2007. (*Id.* ¶ 26.) According to the amended complaint, "[a]s recently as February, 2008, Empi, its affiliated entities, and authorized dealers have again threatened patent litigation against another company which recently began

7

selling electrodes manufactured by Plaintiff's manufacturer. Notably, this recent competitor to the VitalStim Electrodes market, Columbia Scientific, was previously VitalStim's largest dealer. Thus, despite having unsuccessfully prosecuted sham patent litigation against Plaintiff, Empi continued to threaten yet another sham patent litigation against a new upstart competitor for the purpose of foreclosing competition and retaining their monopoly profits." (*Id.* ¶ 30.)

Plaintiff alleges that the litigation was both subjectively and objectively baseless and plausibly supports this claim with the assertion that there could be no valid patent claim due to the existence of "prior art." (Plaintiff's Memorandum of Law, at 6.) At this stage of litigation, such allegations are sufficient to withstand a motion to dismiss. *Louisiana Wholesale Drug Co., Inc. v. Sanofi-Aventis*, No. 07 Civ. 7343(HB), 2008 WL 169362, at *5 (S.D.N.Y. Jan. 18, 2008); *ICOS Vision System Corp., N.V. v. Scanner Tech. Corp.*, 2006 WL 838990 (S.D.N.Y. Mar. 29, 2006) ("If, as alleged, Scanner knew that § 271(g) did not apply and threatened litigation for the sole purpose of harming ICOS, then its threats were neither objectively reasonable nor taken in good faith. This is all that need be alleged at this early stage of the litigation.").

  b. Business Disparagement as Antitrust Conduct

Defendants also argue that, "as a matter of law, efforts to disparage a competitor do not harm competition." (Defendants' Memorandum of Law, at 12) (citing *Schacher v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989)) ("Warfare among suppliers and their different products *is* competition. Antitrust law does not compel your competitor to praise your product or sponsor your work. To require cooperation or friendliness among rivals is to undercut the intellectual foundations of antitrust law.") Although defendants are correct that truthful comparisons made in the competition between products do not constitute anticompetitive behavior, courts recognize that false and misleading statements may provide a basis for antitrust claims. *The Nat'l Ass'n of Pharmaceutical Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988) (stating that "'[a]dvertising that emphasizes a product's strengths and minimizes its weaknesses does not, at least unless it amounts to deception, constitute anticompetitive conduct violative of § 2 [of the Sherman Act]'" but holding that a claim based on a letter alleged to be "false and misleading in certain respects . . . should be allowed to go forward with the discovery process to substantiate its claim.") (quoting *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 287-88 (2d Cir. 1979)). "[A] plaintiff asserting a monopolization claim based on misleading advertising must overcome a presumption that the effect on competition of such a practice was *de minimis*.'" *Pharm. Mfrs.*, 850 F.2d at 916 (citation and quotations omitted). The Second Circuit has adopted several factors to consider in determining whether a plaintiff has overcome this presumption: whether the representations "were (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible of neutralization or other offset by rivals." *Pharm. Mfrs.*, 850 F.2d at 916.

The Second Circuit in *Pharm. Mfrs.* went on to find that, at the motion to dismiss stage,

8

an allegation that the representation was "false and misleading in certain respects" was sufficient "to go forward with the discovery process to substantiate its claim that the [representation] was clearly false, clearly material, and clearly likely to induce reasonable reliance." *Id.* Similarly, here, plaintiff has sufficiently alleged that defendants made statements that were false and misleading to potential clients and, therefore, should be entitled to discovery in order to substantiate its claims. Plaintiff alleges that defendants (including, notably, the manufacturer of VitalStim) repeatedly made representations to potential Alternative Electrodes customers that Alternative Electrodes "(1) may compromise patient safety; (2) may reduce efficacy in terms of patient outcomes; (3) have generated performance concerns by VitalStim clinicians in the field; (4) are not cleared to market by the FDA for the treatment of dysphagia; and, (5) carry unsubstantiated manufacturer claims regarding safety, compatibility and clearance for use with the VitalStim system." (Am. Compl. ¶ 20.) Plaintiff further alleges that these statements are false and misleading and also asserts other allegations which could plausibly support satisfaction of the other above-referenced factors. Defendants argue, among other things, that plaintiff cannot satisfy the requirement for showing that the representations were made to "buyers without knowledge of the subject matter." However, the Court cannot determine, at this early stage of the litigation, as a matter of law, that these factors cannot be satisfied. For example, there is insufficient basis to discern at this juncture whether the statements are unlikely to induce reasonable reliance, whether the buyers are without knowledge of the subject matter, or whether the statements are susceptible to neutralization.[1] Construing the allegations most favorably to plaintiff, including drawing reasonable inferences in its favor, dismissal at this stage is unwarranted. In short, the Court finds "the several factors noted above cannot be adequately evaluated until the discovery process has moved forward to a greater extent than it has thus far." *Pharm. Mfrs.*, 850 F.2d at 916 (finding that, though "pharmacists are likely to have some knowledge of the subject matter discussed in the [representation], and that the representations . . . were made and could only have been made, for [a short period of time]" the claim should proceed to discovery.) If, after discovery, defendants believe that there is insufficient evidence for plaintiff to satisfy these factors, they may move for summary judgment at that time. Accordingly, the motion to dismiss on the ground that plaintiff failed to suffer a cognizable injury and thus lacks standing is denied.

2. Market Definition

"Evaluating market power begins with defining the relevant market." *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 496 (2d Cir. 2004). To adequately plead a Sherman Act violation, therefore, a

---

[1] The Court notes that these issues can be particularly complex where the misleading statements are alleged to have been made by, among others, the manufacturer of the principal product, because one may reasonably infer depending on the circumstances that factors such as the ability to neutralize and the willingness of sophisticated buyers to further research such statements can be negatively affected when such statements allegedly come from the manufacturer of the primary product itself, rather than from a mere competitor who does not speak for the primary product.

9

plaintiff must identify the relevant market, including the geographic market and a relevant product market, and the "alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes – analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (internal quotations marks and citations omitted.). The Second Circuit has defined market analysis as follows:

> The relevant market is defined as all products reasonably interchangeable by consumers for the same purposes, because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level. Reasonable interchangeability sketches the boundaries of a market, but there may also be cognizable submarkets which themselves constitute the appropriate market for antitrust analysis. Defining a submarket requires a fact-intensive inquiry that includes consideration of such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. The term submarket is somewhat of a misnomer, since the submarket analysis simply clarifies whether two products are in fact reasonable substitutes and are therefore part of the same market. The emphasis always is on the actual dynamics of the market rather than rote application of any formula.

*Geneva Pharms.*, 386 F.3d at 496 (internal citations and quotation marks omitted). "Products will be considered to be reasonably interchangeable if consumers treat them as acceptable substitutes." *PepsiCo, Inc. v. Coca-Cola Co.,* 315 F.3d 101, 105 (2d Cir. 2002).

Courts are reluctant to dismiss antitrust claims for failure to plead the relevant product market because determining the relevant market requires a fact-intensive inquiry that is best served by allowing the parties discovery. *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) (collecting cases and noting that "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."). However, there is certainly no bar against dismissal in appropriate cases. *Id*. "'[W]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.'" *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3rd Cir. 1997)).

Plaintiff alleges that the relevant market is "the market for the sale of electrodes compatible for use with VitalStim powered muscle stimulators" in the United States. (Am. Compl. ¶¶ 43, 45.) It argues that this is

the appropriate market because "[e]lectrodes utilized with electrical stimulation devices are not interchangeable with electrodes for use in VitalStim electrical stimulation devices as such general electrodes do not have mini-snap connectors that allow the electrodes to connect to a VitalStim device. Thus, VitalStim branded electrodes and the VS Compatible Electrodes manufactured by Plaintiff's manufacturer are the only electrodes that are reasonably interchangeable for each other with regard to use for the treatment of dysphagia with VitalStim electrical stimulation devices. From the view of an owner of a VitalStim device, no other electrodes are acceptable substitutes." (Plaintiff's Memorandum of Law, at 13; Am. Compl. ¶ 44.)

Defendants do not dispute that plaintiff has sufficiently pled the geographic market. (Defendants' Memorandum of Law, at 14.) Instead, they claim that plaintiff has failed to plead a plausible relevant product market because its "alleged relevant market is an aftermarket for replacement electrodes compatible with a single branded product manufactured and marketed by DJO, *i.e.*, the VitalStim device," and "[s]uch allegations do not plausibly describe a market susceptible of unlawful monopolization because they do not permit 'an inference of monopoly power in the aftermarket that competition in the primary market appears unable to check.'" (Defendants' Memorandum of Law, at 14-15) (citing *SMS Sys. Maint. Servs. v. Digital Equip. Corp.*, 188 F.3d 11, 17-18 (1st Cir. 1999).) In other words, defendants argue that the relevant market cannot plausibly be limited to the market for electrodes for the VitalStim device, but rather should encompass the market for all products aimed at treating dysphagia. They argue that "'[t]he test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but 'commodities reasonably interchangeable by consumers for the same purposes.'" (Defendants' Memorandum in Reply, at 5 (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 438 (3d Cir. 1997) quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). It is not clear at this stage, however, whether there are adequate substitutes for the VitalStim, especially where it is undisputed, (as confirmed by the parties at oral argument), that the VitalStim device is the only electrical stimulator approved by the FDA for the treatment of dysphagia. A relevant market consists of products reasonably interchangeable "for the purposes for which they are produced – price, use and qualities considered." *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 383-84 (S.D.N.Y. 2007). The test of interchangeability is whether users regard the products as the same. *Xerox*, 511 F. Supp. 2d at 384. In this case, taking into consideration "price, use and qualities," it is unclear, at the motion to dismiss stage, that there are reasonably interchangeable products.

The Court also recognizes that, generally, a single brand does not define a product market. *Todd*, 275 F.3d at 200 (dismissal is appropriate where a plaintiff "attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes") (collecting cases). However, courts have found that there are circumstances under which replacement items for a single brand do define a relevant market. For example, the Supreme Court has held that "[b]ecause service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines. . . . The relevant market for antitrust purposes is determined by the choices available to Kodak

11

equipment users." *Eastman Kodak Co. V. Image Tech. Servs.*, 504 U.S. 451, 481-82 (1992). Similarly, it has been found that replacement parts for Xerox machines constitute a relevant market. *Xerox*, 511 F. Supp. 2d at 385. Likewise, at this early stage, plaintiff has reasonably alleged that the relevant market here is the replacement parts for the VitalStim powered muscle stimulator. *See Todd*, 275 F.3d at 203 ("At this stage, it is sufficient that plaintiff has alleged specific facts that support a narrow product market in a way that is plausible and bears a rational relation to the methodology courts prescribe to define a market for antitrust purposes."). In short, the Court concludes that plaintiff has adequately pled market definition.

Plaintiff also argues that "as an alternative to relevant market analysis, pursuant to which monopoly power is proven *indirectly*, monopoly power can also be proven through *direct evidence* of the Defendants' ability to control prices and/or exclude competition." (Plaintiff's Memorandum of Law, at 12 (citing *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986); *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 600 (2d Cir. 2004); *Tops Mkts., Inc. v. Quality Mkts, Inc.*, 142 F.3d 90, 97-98 (2d Cir. 1998) (noting that monopoly power "may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market")).) Defendants argue that plaintiff has not alleged that defendants "control the price of anything other than *its own product*." (Defendants' Reply Memorandum, at 5 (emphasis in original).) This argument is unavailing. By defendants' own admission, until AEL began selling electrodes in October of 2006, "VitalStim device users could only buy replacement electrodes from DJO." (Defendants' Memorandum of Law, at 4.) Plaintiff further alleges that defendants have been able to successfully sell their electrodes, which plaintiff claims are inferior to AEL's, at a 600% profit margin. Such an allegation, along with the other allegations in the amended complaint discussed above, supports a plausible claim that there is monopoly power at work in this market. *See Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481 (1992) ("that Kodak controls nearly 100% of the parts market and 80% to 95% of the service market, with no readily available substitutes, is, however, sufficient to survive summary judgment under the more stringent monopoly standard of § 2."). Market power is defined as the ability to control prices by restricting output. *Tops Mkts.*, 142 F.3d at 98 ("It may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market."). In the instant case, plaintiff has sufficiently alleged a plausible claim that direct monopoly power is exerted by defendants, and their pleadings are sufficient at this stage of proceedings to survive a motion to dismiss.

B. Donnelly Act Claims

Plaintiff also brings a claim of illegal monopoly under New York's Donnelly Act, N.Y. Gen. Bus. L. § 340. The Donnelly Act "is modeled on the Sherman Act and generally is construed in accordance with federal precedent." *Menkes v. St. Lawrence Seaway Pilots' Ass'n*, 07-cv-0373, 2008 U.S. App. LEXIS 5281, at *3 n.3 (2d Cir. Mar. 12, 2008). Defendants make the same arguments against the alleged Donnelly claims as they make against the Sherman Act claims. Because the same analysis applies, for the reasons given *supra* regarding the Sherman Act claims, the Court declines to dismiss plaintiff's Donnelly Act claims.

## C. Business Disparagement/Injurious Falsehood Claim

With respect to the state law claim for business disparagement and injurious falsehood, plaintiff alleges that defendants have made false and misleading statements about its electrodes from 2006 through present. Plaintiff further alleges that these statements were made to potential customers and, in several instances, have resulted in loss of prospective business. Defendants argue that the only statement plaintiff specifically alleges constituted business disparagement (a Risk Management Alert published in November 2006) is time barred. Defendants argue that plaintiff's assertion "in conclusory terms that unidentified statements similar to those in the Alert were made at unspecified times 'to this day'. . . provides insufficient notice regarding the identity of the speaker, to whom the false statements were made, and when." (Defendants' Memorandum of Law, at 7 (citing Am. Compl. ¶ 20).) Further, defendants argue that none of the statements that are within the statute of limitations period are "alleged to be *both* false *and* about AEL." (Defendants' Memorandum of Law, at 7) (emphasis in original.) Next, defendants argue that plaintiff has not sufficiently pled special damages as required. Defendants claim that "[u]nable to identify any loss of business attributable to any specific prospective customer, AEL attempts to satisfy its pleading obligations by merely attaching a list of every single one of Defendants' customers (Am. Compl., Ex. K) – more than 4800 in total – and asserting that it lost sales to 'many if not all' of them." (Defendants' Memorandum of Law, at 8.) Defendants argue that "[i]dentifying *every* customer is no better than identifying *none*, and certainly does not plead the requisite 'loss of customers.'" (*Id*.) (emphasis in original.)

In order to make out a claim for business disparagement, "the plaintiff must show that the defendant published an oral, defamatory statement directed at the quality of a business's goods and must prove that the statements caused special damages." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002); *see also Chamilia, LLC v. Pandora Jewelry, LLC,* No. 04-CV-6017 (KMK), 2007 U.S. Dist. LEXIS 71246, at *58 (S.D.N.Y. Sept. 24, 2007) ("Under New York law, product disparagement consists of: (1) a false statement; (2) published by Defendant to a third party; (3) with malice; and (4) with special damages."). "The New York courts define special damages as the loss of something having economic or pecuniary value. In addition, special damages must be fully and accurately stated, with sufficient particularity to identify actual losses." *MapInfo Corp. v. Spatial Re-Engineering Consultants*, No. 02-CV-1008 (DRH), 2006 U.S. Dist. LEXIS 70408, *41 (N.D.N.Y Sept. 28, 2006) (internal quotations omitted). "Where loss of customers constitutes the alleged special damages, the individuals who ceased to be customers, or who refused to purchase, must be named and the exact damages itemized." *Fashion Boutique of Short Hills*, 2007 U.S. Dist. LEXIS 71246, at *58.

The Court finds that plaintiff has met all of these requirements, with the exception of providing itemized special damages. Plaintiff has identified false and misleading statements made by defendants regarding plaintiff. (Am. Compl. ¶ 20.) Plaintiff alleges that these statements have been made repeatedly over the last few years to potential customers and the general public. Specifically, plaintiff alleges that the assertions made in the November 2006 Risk Management Alert have been repeated until very recently. Plaintiff

13

does not provide exact dates for these statements but does allege with specificity other statements that are certainly not time barred.² For example, Exhibits D and E to the amended complaint are alleged to be "[t]rue and correct copies of VitalStim Form documents, dated January 25, 2008 and January 16, 2008." (Am. Compl. ¶ 23(e).) These documents include statements that plaintiff alleges are false, including that "alternative electrodes are not cleared by the FDA for use with the VS stimulator." (Am. Compl., Ex. E.) Similar statements were made in an alleged communication by Empi's sales representatives as recently as February 15, 2008. (Am. Compl. ¶ 23(f), Ex. F.) Plaintiff further alleges that defendants acted with malice. (Am. Compl. ¶ 66) ("Defendants acted with malice in making such false statements about Plaintiff's VS Compatible Electrodes, because Defendants made such statements with the intent to interfere with another person's interest, or with a deliberate desire to do Plaintiff harm, or because Defendants made such statements recklessly, without regard to consequences, and under circumstances which Defendants should have anticipated to cause injury.") The amended complaint also lists in detail many potential customers that allegedly did not purchase plaintiff's electrodes as a result of false statements made to them by defendants. (*See* Am. Compl. ¶ 22.)

Plaintiff does not, however, itemize the damages resulting from these losses. Plaintiff argues that special damages are not required because "words which would tend to injure a party's trade, occupation or business are slanderous *per se*." (Plaintiff's Memorandum of Law, at 21 (citing *Angio-Medical Corp. v. Eli Lilly & Co.*, 720 F. Supp 269 (S.D.N.Y. 1989)).) Plaintiff relies on *Angio-Medical*'s statement that "[l]anguage which merely disparages a product is not actionable unless special damages are pleaded and it appears that such damage is a natural and immediate consequence of the disparaging statements. If, however, the disparaging statements impeach the business methods or integrity of the plaintiff himself, special damages need not be proved as a direct accusation. The action would then qualify as slander per se instead of trade libel." *Angio-Medical*, 720 F. Supp. at 269 (citations omitted). As a threshold matter, this language refers to a claim of slander *per se*, *not* trade libel. The court in *Angio-Medical* went on to hold that special damages must be pled for the plaintiff's trade libel claim. *Id.* at 274. Plaintiff points to no case law that holds otherwise, nor is the Court aware of any such cases. In any event, plaintiff only has alleged disparaging statements about its product, and the amended complaint does not contain allegations regarding business methods or the integrity of the Company itself. Therefore, special damages must be alleged to sufficiently plead a claim for business disparagement.

Finally, to the extent that plaintiff seeks to satisfy its pleading obligations by attaching a list of all of its customers (more than 4,800 in all) and alleging that it lost sales to "many if not all" of them (Am. Compl. ¶ 67; *Id.*, Ex. K), such allegations are insufficient to satisfy the "special damages" pleading requirement. *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002) ("Where loss of customers constitutes the alleged special damages, the individuals 'who ceased to be customers, or who refused to purchase, must be named,' and the exact damages itemized.") (quoting *Drug Research Corp. v. Curtis Publi'g Co.*, 7 N.Y.2d 435, 441-42 (1960)).

---

² The relevant statute of limitations is one year. N.Y. C.P.L.R. § 215(3).

In sum, plaintiff has not adequately pled special damages and, therefore, this claim is dismissed without prejudice to replead with itemized damages.

### D. Conspiracy Tort Claim

Plaintiff also alleges that "[d]efendants combined and conspired among themselves and with their various third party dealers to interfere with Alternative Electrodes' contracts and prospective business relations and to disparage Alternative Electrodes by engaging in the conduct described above, including, but not limited to, making false statements about Alternative Electrodes' products. Each Defendant agreed and intended to participate in the conspiracy, and engaged in one or more overt acts in the United States or New York, or both, in furtherance of the conspiracy." (Am. Compl. ¶ 78.) Defendants argue that this claim should be dismissed because there is no tort of conspiracy under New York law. Plaintiff argues that, although defendants are correct that no such tort exists, "they fail to recognize that New York law does allow plaintiffs to use conspiracy allegations to connect Defendants to the torts alleged in the Complaint." (Plaintiff's Memorandum of Law, at 23.) Plaintiff relies on *Transit Management LLC v. Watson Indus. Inc.*, 803 N.Y.S.2d 860, 863 (N.Y. App. Div. 2005) to support this claim.

As a threshold matter, and as plaintiff's counsel conceded at oral argument, it is axiomatic that civil conspiracy cannot be alleged as a separate claim because New York law does not recognize civil conspiracy as an independent tort. *See, e.g., Rivera v. Greenberg*, 243 A.D.2d 697, 698 (N.Y App. Div. 1997) ("[T]he Supreme Court should have dismissed the plaintiff's thirtieth cause of action, which alleges conspiracy to defame, since New York does not recognize civil conspiracy as an independent tort . . . .") (citation omitted); *accord Transit Management*, 803 N.Y.S.2d at 863 ("it is well established that New York does not recognize civil conspiracy as an independent tort"); *see also Treppel v. Biovail Corp.*, 03 cv 3002 (PKL), 2005 U.S. Dist. LEXIS 18511, at *17 (S.D.N.Y. Aug. 30, 2005) ( "Under New York law, a claim for civil conspiracy may stand only if it is connected to a separate underlying tort."). Therefore, to the extent that plaintiff alleges conspiracy as a separate "fourth cause of action," that separate claim must be dismissed.

However, although it is not permitted as a separate cause of action, allegations of conspiracy may survive in a complaint under certain circumstances. As explained in *Transit Management*, "[a]llegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort." (*Transit Management*, 803 N.Y.S.2d at 863) (quoting *Alexander & Alexander of N.Y. v. Fritzen*, 68 N.Y.2d 968, 969 (N.Y. 1986)). Thus, "[w]hile there is no cognizable action for a civil conspiracy, a plaintiff may plead conspiracy in order to connect the actions of the individual defendants with an actionable underlying tort and establish that those acts flow from a common scheme or plan." *American Preferred Prescription, Inc. v. Health Mgmt., Inc.*, 252 A.D.2d 414, 416 (N.Y. App. Div. 1998).

To properly plead civil conspiracy for these limited purposes, "a plaintiff must allege both a primary tort and also show the four elements of a conspiracy, namely: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Fezzani v. Bear,*

15

*Stearns & Co.*, 09 cv 0793 (PAC), 2008 U.S. Dist. LEXIS 71943, at *22-*23 (S.D.N.Y. Sept. 22, 2008). Plaintiff has satisfied this pleading requirement. (Am. Compl. ¶¶ 78-79.) Therefore, although the Court dismisses the conspiracy claim as a separate cause of action, it will permit the conspiracy allegations to remain for the purposes described above.

### E. Tortious Interference with Existing and Prospective Economic Advantage

Defendants argue that plaintiff has not sufficiently pled a tortious interference claim because it has not alleged that "but for Defendants' allegedly wrongful behavior plaintiff would have entered a contract with any party." (Defendants' Memorandum of Law, at 23.) Instead, plaintiff alleges that defendants' conduct "was a substantial factor in preventing Plaintiff from entering into such contracts." (Am. Compl. ¶ 72.) Defendants argue that this is insufficient. For the reasons set forth below, the Court agrees.

Under New York law, the elements of a claim for tortious interference are that (1) the plaintiff "had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003). In addition, under New York law, plaintiff must allege that but for defendants' wrongful conduct, plaintiff would have entered into a prospective contract or an existing contract would not have been breached. *Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820, 828 (2d Cir. 1990) ("Intentional procurement of a breach is an essential element of the tort of interference with contractual relations. A plaintiff must allege that there would not have been a breach but for the activities of defendants.") (internal quotations omitted); *Diario El Pais, S.L. v. Nielsen Co.*, 07 cv 11295 (HB), 2008 U.S. Dist. LEXIS 92987, *22-*23 (S.D.N.Y. Nov. 6, 2008) ("To render Plaintiffs' tortious interference claim 'plausible,' [s]ee Iqbal, 490 F.3d at 158 (2d Cir. 2007), Plaintiffs must provide some factual allegations that but-for Defendant's alleged acts, Plaintiffs would have entered into contracts with specific prospective advertisers or maintained consistent levels of advertising with their existing advertisers.") (citing *School of Visual Arts v. Kuprewicz*, 771 N.Y.S.2d 804, 813 (N.Y. Sup. Ct. 2003) ("It is well-settled that an essential element of [the intentional interference with prospective economic advantage] tort is that the plaintiff would have consummated a contract with another person but for the interference of the defendant"); *Zhang v. Wang*, 05 cv 3888 (FB) (LB), 2006 U.S. Dist. LEXIS 74203, at *5 (E.D.N.Y. Oct. 12, 2006) ("The plaintiff must also assert the defendant's actions were the 'but for' cause of the alleged breach of contract, that is, that there would not have been a breach but for the activities of the defendant."); *Corporate Training Unlimited v. NBC*, 868 F. Supp. 501, 513 (E.D.N.Y. 1994) ("Under New York law, interference with pre-contractual relations is actionable where a contract would have been entered into but for the malicious, fraudulent, or deceitful acts of a third party."). In arguing that it need only allege that defendants' actions were a substantial factor preventing the completion of a contract, plaintiff relies on *Utility Metal Research, Inc.*, No. 03 CV 1463 (SLT)(SMG), 2008 WL 850456, at *8 (E.D.N.Y. Mar. 28, 2008). *Utility Metal* stated in *dicta* that "[a] plaintiff claiming tortious interference with contract is obligated to establish that intentional acts on the part of a defendant were a substantial factor in the

disruption of the contract," citing to a New York state court case from 1972 which explicitly stated that "in order to recover for tortious interference of contract, there had to exist a valid contract between a plaintiff and another, defendant's knowledge of that contract, his intentional interference with or procuring of a breach thereof without justification, and a showing by plaintiff that, *but for his unlawful actions, plaintiff would have received the contract.*" *Bryce v. Wilde*, 31 N.Y.2d 882 (N.Y. 1972) (emphasis added). This Court does not find that case to support plaintiff's argument.

In sum, because plaintiff has failed to allege that defendants' alleged tortious interference was a "but for" cause in preventing the contractual relationship with another party, this claim is dismissed. However, the Court will provide plaintiff, if it wishes, an opportunity to re-plead to correct this pleading defect.

F. Breach of Contract

With respect to the breach of contract claim, plaintiff alleges that it entered into a confidential settlement agreement with defendants on August 23, 2007. (Am. Compl. ¶ 105, Ex. G.) According to the amended complaint, defendants agreed to provide plaintiff any "test and/or clinical data showing that [p]laintiff's products are unsafe for use with the VitalStim device; could cause potential legal liability; are unsafe for the treatment of dysphagia using the VitalStim device; or are unsafe for use with the VitalStim device on the anterior portion of the neck." (*Id.* ¶ 106.) Plaintiff alleges that defendants provided no such information, but "[d]espite this lack of data and their binding agreement to refrain from their product disparagement campaign, [d]efendants continue to make false and malicious statements about Alternative Electrodes' products in an attempt to protect their monopoly." (*Id.* ¶ 107; Ex. G. at 4-5.)

Defendants argue that only one of the defendants, Encore Medical – not Empi, was a party to the August 2007 settlement agreement. Further, the only statements plaintiff alleges violated this agreement were made by Empi, not Encore Medical. (Defendants' Memorandum of Law, at 24.) Plaintiff asserts that "Encore's possession of [the license to sell the VitalStim technology] would likely make Empi Encore's agent so that Encore would be liable for the Empi statements which breached the settlement agreement." (Plaintiff's Memorandum of Law, at 25.) The Court finds the allegations to be sufficient to survive a motion to dismiss.

Further, defendants argue that, even if the statements were made by Encore Medical, nothing in them would violate the settlement agreement. This argument is unavailing. Plaintiff alleges that amended complaint Exhibit E was posted on Empi's website in January 2008. That document states:

> The alternative electrodes are not cleared by the FDA for use with the VS stimulator; they are only cleared for general use. The FDA must clear both stimulator and electrodes for their intended use (treatment of dysphagia) and they have only done so for the VS device and electrodes. This is important because there are no data to support AE's contention that their electrodes are safe to be used with the VS device.
>
> I know many PT's think that electrodes are just passive devices and have no influence on the

17

safety of treatment, but this is not true. The impedance of the electrodes (much higher for AE) influences how current flows and how the device operates. VitalStim has been proven safe for use on the anterior portion of the neck with the specially designed hardware AND electrodes. The VitalStim electrodes are currently the only electrodes that are designed and tested to safely handle the current load and current density of the VitalStim unit without creating hot spots that could potentially injure a patient.

(Am. Compl., Ex. E.) Whether this and/or other statements constitute a breach of the settlement agreement cannot be decided at the motion to dismiss stage of the proceedings in this case. In short, plaintiff has adequately pled a breach of the settlement agreement, and defendants' motion to dismiss this claim is denied.

### IV. CONCLUSION

For the reasons stated, defendants' motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), is granted with respect to plaintiff's state law claims for business disparagement/injurious falsehood, conspiracy (to the extent it is alleged as a separate cause of action), and tortious interference with existing and prospective economic advantage. However, plaintiff may file an amended complaint within 30 days of this Memorandum and Order to address the pleading defects identified by the Court with respect to the business disparagement/injurious falsehood claim and the tortious interference with existing and prospective economic advantage claim. Defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is denied as to all other claims, including the Sherman Act claims.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: February 4, 2009
Central Islip, NY

\* \* \*

The attorney for plaintiff Alternative Electrodes, LLC is Evan M. Janush, Esq. of the Lanier Law Firm, Tower 56, 126 East 56th Street, 6th Floor, New York, New York, 10022. The attorneys for the defendants Empi, Inc. and Encore Medical, L.P. are Kenneth I. Schacter, Esq. and Theo J. Robins, Esq. of Bingham McCutchen LLP, 399 Park Avenue, New York, New York, 10022.